UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SHARON LAJEUNESS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 4:18-cv-1408-SPM |
| | ) |
| | ) |
| | ) |
| ANDREW M. SAUL,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Defendant Andrew M. Saul, Commissioner of Social Security (the "Commissioner") denying the application of Plaintiff Sharon LaJeuness ("Plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (the "Act"). The parties consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 5). Because I find the decision denying benefits was not supported by substantial evidence, I will reverse the Commissioner's denial of Plaintiff's application and remand the case for further proceedings.

---

[1] On June 4, 2019, Andrew M. Saul became the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Commissioner Saul is substituted for Nancy A. Berryhill as defendant in this action. No further action needs to be taken to continue this suit by reason of the last sentence of 42 U.S.C. § 405(g).

I.   **PROCEDURAL BACKGROUND**

On April 24, 2015, Plaintiff applied for DIB. (Tr. 152). Her application was initially denied. (Tr. 78). On October 23, 2015, Plaintiff filed a Request for Hearing by Administrative Law Judge ("ALJ") (Tr. 86). On July 11, 2017, Plaintiff testified at a hearing before the ALJ; on the same date, Plaintiff amended her alleged onset date from June 27, 1971 to June 17, 2013. (Tr. 26-63, 165). On December 26, 2017, the ALJ issued an unfavorable decision. (Tr. 7-25). On February 23, 2018, Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's Appeals Council. (Tr. 148). On June 5, 2018, the Appeals Council denied Plaintiff's request for review. (Tr. 1-6). The decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

II.   **FACTUAL BACKGROUND**

On July 11, 2017, Plaintiff testified at the hearing before the ALJ as follows. (Tr. 28). She was 46 years old and had a ninth-grade education. (Tr. 36). She last worked in June 2013, at Walmart; she worked there for almost nine years. (Tr. 37). She worked primarily in customer service; she was on her feet and had to lift and carry up to 50 pounds. (Tr. 38). She was stopped working because she was fired, ostensibly for taking too-long breaks; she believes she was actually fired because she was taking intermittent FMLA leave. (Tr. 38-39).

Plaintiff is able to drive a car, cook very simple meals, and dress and bathe herself. (Tr. 50-51). She has a shower chair, and she would not be able to shower without it. (Tr. 51). She uses a motorized cart and gets a stockman or cart boy to help her at the grocery store. (Tr. 51). Her daughter comes and does most of her laundry. (Tr. 50).

Plaintiff was diagnosed with rheumatoid arthritis in April of 2011, by Dr. Hoffman; this mostly affects her hand, legs, and arms, but it also affects all of her joints. (Tr. 39). She drops

things all the time. (Tr. 40-41). If she holds a phone for too long, her hand falls asleep. (Tr. 50). She has to sleep with a brace on her right hand, or the burning and tingling will wake her up. (Tr. 41). Her back also gets very weak, and her legs get weak if she stands for more than ten minutes. (Tr. 43). She has trouble walking a distance. (Tr. 43). She has swelling and pain in her knees. (Tr. 40). She cannot lift more than about five pounds. (Tr. 44). She also has problems sitting; if she sits for more than 30 minutes or so, her lower back and upper back hurt. (Tr. 44). Plaintiff has had quite a few different medications for the rheumatoid arthritis; she thinks her current ones are effective, but they have often been changed. (Tr. 41).

Plaintiff also has carpal tunnel syndrome. (Tr. 41). She had a nerve conduction study and was verbally told that she had carpal tunnel in both hands. (Tr. 42). Her doctor told her the Gabapentin should help with that, and it has. (Tr. 42). She has had some injections in her right hand. (Tr. 43). She was apprehensive about getting surgery, but testified that it might come to that. (Tr. 42).

Plaintiff also has fibromyalgia, which causes pain in her nerves. (Tr. 44-45). On a bad day, she cannot even get out of bed, except to go to the bathroom; those days are getting more and more frequent, about four days a week. (Tr. 45). On a good day, she can sit in a chair for a while and have a friend over to sit and talk. (Tr. 46).

Plaintiff's energy level is better since she started Adderall, but there are some days when she is still very tired. (Tr. 46-47). She sleeps well at night and usually takes a nap during the day. (Tr. 47). Plaintiff has a "horrible" short-term memory. (Tr. 47). Her doctor told her it could be caused by the fibromyalgia or by her medication. (Tr. 47). Plaintiff also testified that she sometimes has a problem thinking of what words to use. (Tr. 48). She cannot keep her focus when

reading online; she usually gets distracted easily. (Tr. 48). Plaintiff also has depression and does very little socially. (Tr. 48-49). She does very little socially now. (Tr. 49).

With regard to the medical and other evidence in the record, the Court adopts the facts as presented in the parties' respective statements of fact. The Court will cite to specific portions of the record as needed in the discussion below.

### III. STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines as disabled a person who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he [or she] lives, or whether a specific job vacancy exists for him [or her], or whether he [or she] would be hired if he [or she] applied for work." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. § 404.1520(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then the claimant is not

disabled. 20 C.F.R. § 404.1520(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. § 404.1520(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. § 404.1520(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e). At Step Four, the Commissioner determines whether the claimant can return to his or her past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his or her past relevant work, the claimant is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c)(2); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 404.1560(c)(2).

## IV. THE ALJ'S DECISION

Applying the foregoing five-step analysis, the ALJ here found that Plaintiff meets the insured status requirement of the Act through December 31, 2018 and has not engaged in substantial gainful activity since June 27, 1971, the original alleged onset date. (Tr. 12). The ALJ found that Plaintiff had the severe impairments of degenerative disc disease, rheumatoid arthritis, peripheral neuropathy/carpal tunnel syndrome, fibromyalgia, plantar fasciitis, a major depressive disorder, and attention deficit disorder, and that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (Tr. 12-13). The ALJ found that Plaintiff had the following RFC:

> To perform a range of sedentary work as defined in 20 CFR 404.1567(a) in that she can lift, carry, push, or pull 10 pounds occasionally and less than 10 pounds frequently; sit for 6 hours in an 8-hour workday; stand or walk for 2 hours in an 8-hour workday; frequently handle, finger, and feel; never climb ropes, ladders, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; no exposure to unprotected heights and hazardous machinery; and she is able to perform at least simple, routine tasks.

(Tr. 15-16). At Step Four, the ALJ found that Plaintiff was unable to perform her past relevant work. (Tr. 19). At Step Five, relying on the testimony of a vocational expert, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform, including ticket taker; optical goods assembler; and touch up screener, printer circuit board

assembly. (Tr. 19-20). The ALJ concluded that Plaintiff had not been under a disability, as defined in the Act, from June 27, 1971 (the original alleged onset date) through the date of her decision, December 26, 2017. (Tr. 20).

## V. DISCUSSION

Plaintiff challenges the ALJ's decision on two grounds: (1) that the ALJ failed to properly evaluate Plaintiff's RFC; and (2) that the ALJ failed to fully and fairly develop the record.

### A. Standard for Judicial Review

The decision of the Commissioner must be affirmed if it complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore*, 572 F.3d at 522). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

7

### B. The RFC Evaluation

Plaintiff's first argument is that the ALJ did not properly evaluate Plaintiff's RFC. A claimant's RFC is "the most a claimant can do despite [the claimant's] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). "When assessing a claimant's RFC, the ALJ must consider all relevant evidence in the record." *Julin v. Colvin*, 826 F.3d 1082, 1089 (8th Cir. 2016). However, "a claimant's RFC is a medical question, and some medical evidence must support the RFC determination." *Id.* "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quoting *Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008)).

Plaintiff makes several arguments as to why the ALJ failed to properly evaluate Plaintiff's RFC, challenging the ALJ's finding that Plaintiff was capable of frequently handling, fingering, and feeling despite her rheumatoid arthritis; several statements the ALJ made with regard to the pain treatment modalities Plaintiff did and did not pursue; the ALJ's failure to consider obesity in determining RFC; and the ALJ's evaluation of Plaintiff's mental impairments.

After careful review of the ALJ's decision and the record as a whole, the Court agrees with Plaintiff that the ALJ mischaracterized the medical evidence in several ways that may have affected the RFC finding. In finding that Plaintiff was capable of frequently handling and fingering, despite her complaints of weakness in her hands and frequently dropping things, the ALJ emphasized the absence of swelling and other objective signs of rheumatoid arthritis. The ALJ wrote, "There are no significant signs of joints swelling or any other objective signs that [Plaintiff's] rheumatoid arthritis is damaging the joints in her hands and fingers." (Tr. 16). The ALJ also wrote that "the record just does not show many signs of Rheumatoid Arthritis. She

8

sometimes has tender joints, but her joints are not swollen, warm, or have any outward sign of damage." (Tr. 17). These statements appear to be contradicted by the treatment notes of Dr. Hoffman, Plaintiff's rheumatologist, which do contain indications of swelling and other objective signs associated with rheumatoid arthritis. Shortly before Plaintiff's alleged disability onset date, Dr. Hoffman made numerous objective findings associated with rheumatoid arthritis, including findings of loss of motion in the hands, synovitis[2] in the wrists, elevated rheumatoid arthritis factor "consistent with rheumatoid arthritis," and elevated sedimentation rate.[3] (Tr. 257, 287, 294, 301). Similar objective signs were observed during the alleged disability period. In January 2016, Plaintiff had tests showing elevated rheumatoid factor and elevated sedimentation rate. (Tr. 339, 357). On July 21, 2016, Dr. Hoffman noted swollen joints in Plaintiff's hand and wrists, as well as synovitis in her hands, and she diagnosed seropositive rheumatoid arthritis. (Tr. 342-43). On January 10, 2017, Dr. Hoffman noted that Plaintiff had swollen joints in the hand and wrist, as well as synovitis in the hands and wrists. (Tr. 348-49). Dr. Hoffman also noted that Plaintiff was currently on Imuran with "inadequate control" of her rheumatoid arthritis. (Tr. 346). On May 10, 2017, Dr. Hoffman noted that Plaintiff had "seropositive RA with a high sedimentation rate suggesting inflammation," and she found synovitis in the hands. (Tr. 351, 354). These notes contain significant objective findings of rheumatoid arthritis, including swelling and other

---

[2] Synovitits is "[i]nflammation of a synovial membrane, especially that of a joint; in general, when unqualified, the same as arthritis." *Stedman's Medical Dictionary* 1920 (28th ed.2006).

[3] "The sedimentation rate—or 'sed rate,' for short—is a blood test that checks for inflammation in your body. It's one clue for your doctor that you might have a disease linked to inflammation, like arthritis or cancer." https://www.webmd.com/a-to-z-guides/qa/what-is-the-sedimentation-rate (last visited September 11, 2019).

9

objective signs. The Court notes the ALJ did not discuss any of the findings in Dr. Hoffman' treatment notes from 2016 or 2017, and it is unclear whether she considered them.

The ALJ also stated that Plaintiff "reported problems using her hands, but has not been seeking treatment for years." (Tr. 19). However, as discussed above, Dr. Hoffman's treatment notes show that Plaintiff did seek and receive treatment for her hand problems several times in the two years immediately preceding the ALJ's decision. It is not clear how the ALJ came to this conclusion.

Additionally, it appears that the ALJ mischaracterized the record with regard to Plaintiff's refusal to follow conservative treatment measures for her alleged pain. The ALJ stated:

> The claimant described how she requires narcotic medications for pain relief. While she may believe this, as reflected in Exhibit 4F, when she saw pain relief specialists, they recommended using ice, wearing the LSO [lumbar support orthosis], being more active, doing home exercises and doing physical therapy before narcotic pain medication. If these measures were not successful, then pain relief injections, similar to the injections that previously provided relief. Only after these failed would she be placed on a narcotic pain relief medication. Her response to these recommendations was to stop seeing that provider and return to the provider who prescribed narcotic pain relief medication.

(Tr. 17). In evaluating Plaintiff's subjective symptoms, the ALJ also stated:

> One factor to be considered concerns the measures she takes in addition to her medications to relieve her pain. She was advised to apply ice. There is no indication she ices her back. She says she wears the LSO, but also said she was not wearing it because it did not help. She was advised to be more active, do home exercises and walk more, but has failed to do so. She has demonstrated she is not going to try to help herself. She was told to try exercise and therapy. If that did not work, try injections. Only if these were not successful would she be placed back on narcotic pain medication. Instead, she returned to a doctor who would prescribe narcotics for her.

(Tr. 17). The ALJ later stated, "She is advised the best thing she can do for herself is be more active and apply ice when something hurts." (Tr. 19).

10

These statements do not appear to be supported by the record. Exhibit 4F, cited by the ALJ, shows that Plaintiff went to St. Louis Neuropathy and Pain Relief and saw a nurse practitioner on two occasions: once on July 28, 2016, and once on February 28, 2017. At the July 2016 visit, Plaintiff was told to continue the pain medications prescribed by her treating rheumatologist, which included narcotic pain relief medication. (Tr. 320). At the February 2017 visit, it was noted that Plaintiff was no longer taking narcotic pain medication, and Plaintiff was advised to wear an LSO, be more active, walk, and do home exercises before restarting narcotic pain medication. (Tr. 317). The Court finds no support for the ALJ's repeated statements that Plaintiff was advised to apply ice for her symptoms or for the ALJ's suggestion that Plaintiff failed to follow the suggestion to ice her back.[4] There are no medical treatment records dated after the February 2017 visit, and the Court does not find in the record any support for the ALJ's statement that Plaintiff failed to follow the nurse practitioner's suggestions to be more active, do home exercises, and walk more. The Court also does not find any support for the ALJ's statement that Plaintiff "has demonstrated she is not going to help herself." At the hearing, Plaintiff reported that although the LSO she was prescribed does not help her, she still wears it. (Tr. 52-53). She also testified that she liked the pain management clinic because they tried to do treatment without opioid use, though she had had a hard time getting a ride to go there lately. (Tr. 52). Given the absence of treatment records dated after the February 2017 recommendation of conservative measures, it is also not entirely clear why the ALJ found that Plaintiff's "response to the recommendation[] [for conservative treatment] was

---

[4] The only reference to "ice" that the Court has found in the medical record is a July 2016 note stating that Plaintiff "reports ice packs make the pain better." (Tr. 319).

11

to stop seeing that provider and return to the provider who prescribed narcotic pain relief medication." Moreover, even if Plaintiff did return to Dr. Hoffman (who had previously prescribed her narcotic pain relief medication) after February 2017, the record makes clear that Dr. Hoffman was not merely a "provider who prescribed narcotic pain relief medication," but was Plaintiff's longtime treating rheumatologist, who provided her with narcotic pain relief medication, non-narcotic medication for her various physical impairments, and medication for her mental impairments; it is unclear why she would be faulted to for returning to her longtime treating rheumatologist for treatment after seeing a nurse practitioner at a pain management clinic.

The Eighth Circuit has noted that "[w]hile a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case,' inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand.'" *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) (quoting *Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000)). In the instant case, the Court cannot say that the misstatements discussed above had no practical effect on the outcome of the case. Because this case does not involve any opinion evidence regarding Plaintiff's physical ability to function, the ALJ's RFC finding rests largely on the ALJ's evaluation of the objective medical evidence and the ALJ's evaluation of the consistency of Plaintiff's subjective complaints with the record as a whole. The misstatements in the decision relate directly to central issues in this case: the degree to which Plaintiff's rheumatoid arthritis affects her ability to use her hands and wrists, and the degree to which Plaintiff's back pain affects her ability to sit, stand, and walk. The Court cannot say that the ALJ would have reached the same conclusions regarding Plaintiff's RFC had she properly considered the objective findings of rheumatoid arthritis in Plaintiff's hands and the evidence regarding Plaintiff's course of treatment for back pain. Significantly, had the ALJ reviewed Dr.

Hoffman's findings and reached a different conclusion with regard to Plaintiff's handle, finger, and feel, it could have changed the outcome of the case: the vocational expert testified that an individual with Plaintiff's other limitations who could only occasionally handle, finger and feel could not perform competitive work. (Tr. 56).

Because the ALJ mischaracterized and failed to discuss significant evidence in the record that tends to support Plaintiff's allegations, and because that mischaracterization may have affected the outcome of the case, the Court cannot say that the ALJ's findings with regard to Plaintiff's RFC are supported by substantial evidence. Therefore, the Court will remand the case for further consideration of the relevant evidence. The Court need not consider Plaintiff's remaining arguments.

## VI.   CONCLUSION

For the reasons set forth above, the Court finds that the decision of the Commissioner is not supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **REVERSED** and that this case is **REMANDED** under Sentence Four of 42 U.S.C. § 405(g) for reconsideration and further proceedings consistent with this opinion.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 11th day of September, 2019.